824 So.2d 143 (2002)
CITY OF MIAMI, Appellant,
v.
Patrick McGRATH III, et al., Appellee.
No. SC01-1562.
Supreme Court of Florida.
July 11, 2002.
*144 Alejandro Vilarello and Maria J. Chiaro, Miami, FL; and Joseph H. Serota, Mitchell A. Bierman, and Christopher F. Kurtz of Weiss, Serota, Helfman, Pastoriza & Guedes, P.A., Miami, FL, for Appellant.
Thomas J. Korge and Christopher G. Korge of Korge & Korge, Coral Gables, FL; and Mark J. Heise and David Markarian of Heise Markarian Foreman, Miami, FL, for Appellees.
Robert A. Ginsburg, Miami-Dade County Attorney, and Jess McCarty, Assistant County Attorney, Miami, FL, for Miami-Dade County and Laureen Varga, Intervenors/Appellees.
PARIENTE, J.
We have on appeal a decision of the Third District Court of Appeal declaring invalid a state statute. See McGrath v. City of Miami, 789 So.2d 1168 (Fla. 3d DCA 2001). We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we conclude that section 218.503(5)(a), Florida Statutes (1999), constitutes a special law authorizing the imposition of non-ad valorem taxes in violation of the Florida Constitution, we affirm the Third District's decision in this case.

BACKGROUND
In 1999,[1] the Florida Legislature enacted section 218.503(5), which authorizes a municipality to impose a parking tax but restricts which municipalities may impose the tax as follows:
(5)(a) The governing authority of any municipality with a resident population of 300,000 or more by April 1, 1999, and *145 which has been declared in a state of financial emergency pursuant to this section within the previous two fiscal years may impose a discretionary per vehicle surcharge of up to 20 percent on the gross revenues of the sale, lease, or rental of space at parking facilities within the municipality that are open for use to the general public.
. . . .
(c) This subsection is repealed on June 30, 2006.[2]
In July 1999, the City of Miami ("City") implemented the statute by passing an ordinance authorizing the levying of a parking tax, which became effective September 1, 1999.
Patrick McGrath, III, filed a complaint against the City, challenging the constitutionality of the ordinance and section 218.503(5)(a). McGrath claimed that the statute constitutes a special law passed under the guise of a general law, and thus is unconstitutional under article VII, sections 1(a) and 9(a), of the Florida Constitution.[3] Miami-Dade County ("County"), and one of its employees, Laureen Varga, *146 challenged the constitutionality of the ordinance and section 218.503(5)(a) in another case, and intervened as plaintiffs in this case.
The City and McGrath filed cross-motions for summary judgment, and the County and Varga joined in support of McGrath's motion. The trial court granted the City's motion for summary judgment, upholding the constitutionality of the ordinance and section 218.503(5)(a). The Third District reversed, however, holding that section 218.503(5)(a) is an unconstitutional special law,
because by anchoring the 300,000 population classification to the specific date of April 1, 1999, it does not operate uniformly among all cities that reach the 300,000 population threshold as is required by general law. Cities that reach the population threshold after April 1, 1999 are forever excluded from the class. As worded, the statute is no different than if it had identified by name the three particular cities to which it relates. See Fort v. Dekle, 138 Fla. 871, 190 So. 542 (1939); Walker v. Pendarvis, 132 So.2d 186 (Fla.1961); Ocala Breeders' Sales Company, Inc. v. Florida Gaming Centers, Inc., 731 So.2d 21 (Fla. 1st DCA 1999).
Since a statute which constitutes a special law cannot impose a non-ad valorem tax, the statute is unconstitutional. See Alachua County v. Adams, 702 So.2d 1253 (Fla.1997). Accordingly, the trial court erred in finding the ordinance was validly enacted and in granting summary judgment for the City. Therefore, the case must be reversed and the cause remanded to grant summary judgment in favor of the appellants/taxpayers.
McGrath, 789 So.2d at 1169.

ANALYSIS
The issue in this case is whether section 218.503(5)(a), which authorizes only certain municipalities to impose a parking tax, constitutes a special law in violation of the Florida Constitution. Section 218.503(5)(a) comes before this Court "clothed with a presumption of constitutionality," Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 881 (Fla.1983), and this Court's review of the Third District's decision is de novo. See Florida Fish & Wildlife Conservation Comm'n v. Caribbean Conservation Corp., Inc., 789 So.2d 1053, 1054 (Fla. 1st DCA 2001) (holding that whether a state statute is constitutional is a pure question of law subject to de novo review).
Rather than applying to all municipalities, the statute applies only to municipalities that have a resident population of 300,000 or more on April 1, 1999, and have been declared in a state of financial emergency pursuant to this statute within the previous two fiscal years. By virtue of the limiting date of April 1, 1999, only three municipalitiesMiami, Tampa, and Jacksonville[4] potentially qualify as being able *147 to impose the parking tax.[5] Thus, appellees contend that the statute is effectively no different than if those three municipalities had been identified by name in the statute.
The Florida Constitution allows a local government to impose a non-ad valorem tax only as authorized by general law. See art. VII, §§ 1(a), 9(a), Fla. Const. In other words, the Florida Constitution prohibits the Legislature from authorizing a local government from imposing a non-ad valorem tax by special law. We explained the purpose of the constitutional prohibition against the Legislature passing a special law authorizing municipalities to levy non-ad valorem taxes in Alachua County v. Adams, 702 So.2d 1253, 1254 (Fla.1997):

The overriding purpose of [article VII, section (1)(a)] is to make a constitutional division of tax revenues between those available for state uses and those reserved for local government. The phrase "all other forms of taxation" obviously refers to any tax other than those previously designated ad valorem taxes on real property and tangible personal property. This provision is designed to prevent the legislature from undermining non-ad valorem tax sources needed to support state government by the enactment of special laws authorizing local governments to impose non-ad valorem taxes for local purposes.

... [Article VII, section 9(a)] permits the legislature to authorize counties to levy non-ad valorem taxes, of whatever form or description, but only by general law. A determination that a special law may allow a county to redirect the tax proceeds in a manner explicitly contrary to the general law which authorized the tax in the first place would clearly undercut the purposes of article VII, section 9(a).
(Emphasis supplied.)[6]
In this case, it is undisputed that the City's parking tax constitutes a non-ad valorem *148 tax that was authorized by the Legislature's passage of section 218.503(5)(a). Therefore, the only question in this case is whether section 218.503(5)(a) constitutes a special law. This Court has explained the distinction between general laws and special laws:
A law that operates universally throughout the state, uniformly upon subjects as they may exist throughout the state, or uniformly within a permissible classification is a general law. State ex rel. Landis v. Harris, 120 Fla. 555, 163 So. 237 (Fla.1934). We recognize that the legislature has wide discretion in establishing statutory classification schemes and that a law applying uniformly within a permissible classification is a general law. Shelton v. Reeder, 121 So.2d 145 (Fla.1960). A statute relating to a subdivision of the state, based upon proper distinctions and differences that inhere in or are peculiar or appropriate to a class, is a general law. Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879 (Fla.1983); Shelton. ... Statutes that employ arbitrary classification schemes are not valid as general laws. West Flagler; Shelton.

Department of Bus. Regulation v. Classic Mile, Inc., 541 So.2d 1155, 1157 (Fla.1989).
We then explained the definition of a special law:
The constitution defines a special law as a special or local law. Art. X, § 12(g), Fla. Const. As explained in case law,

a special law is one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal; a local law is one relating to, or designed to operate only in, a specifically indicated part of the State, or one that purports to operate within classified territory when classification is not permissible or the classification is illegal.

State ex rel. Landis v. Harris, 120 Fla. 555, 562-63, 163 So. 237, 240 (1934) (citations omitted); State ex rel. Gray v. Stoutamire, 131 Fla. 698, 179 So. 730 (1938); State ex rel. Buford v. Daniel, 87 Fla. 270, 99 So. 804 (1924). See generally 10 Fla. Jur.2d Constitutional Law § 330 (1979).
Id.
To determine whether section 218.503(5)(a) constitutes a special law, we must decide whether the law is designed to operate upon particular municipalities through its restrictive classification system, and whether the classification in this case, which limits application of the statute to municipalities with over 300,000 residents on or before April 1, 1999, is arbitrary. In other words, we must determine whether this statute is "based upon proper distinctions and differences that inhere in or are peculiar or appropriate to a class," Classic Mile, 541 So.2d at 1157, or whether this statute is designed to operate upon or benefit only particular municipalities and thus is essentially no different than if the statute had identified the particular municipalities by name.
Over sixty years ago, this Court held that a statute that applied to a particular population size and was tied to a specific date, so that no other entities could ever fall within the confines of the statute, constituted an invalid special law. See Fort v. Dekle, 138 Fla. 871, 190 So. 542, 542-43 (1939). In Fort, the Court considered the constitutionality of a statute requiring residents in counties having a population of 150,000 or more according to the 1935 State census to re-register as voters for all elections to be held in 1938 and each election thereafter. Id. at 542. The Court *149 rejected the argument that because the statute applied to three counties, it did not constitute a special law, explaining: "The Act is just as much a special and local Act as if the Counties of Hillsborough, Duval and Dade had been named in the Act because those are the only three counties in the State to which the Act could ever be applicable, as no other counties in the State had a population of more than 150,000 according to the State census of 1935." Id. at 542-43 (Emphasis supplied.)
Similarly, in Walker v. Pendarvis, 132 So.2d 186, 192-93, 195 (Fla.1961), the Court held that several statutes that limited their application to a specific population size and a specific date constituted invalid special laws. The Court first considered a statute that set the maximum salary for justices of the peace in all counties in Florida having a population in excess of 300,000 according to the preceding official census. See id. at 192. The Court held that the statute constituted a special law because "its application is limited to Duval County, and cannot be a general law by classification because the classification factors bear no reasonable relation to the subject regulated." Id. at 192-93. The Court cited its earlier decision in Carter v. Norman, 38 So.2d 30, 32 (Fla.1948), in which the Court stated: "The classification of counties for governmental purposes according to population is entirely permissible in the enactment of a general statute, so long as the classification used is just and reasonable." Walker, 132 So.2d at 193
The Court also considered two statutes, one of which provided that constables in "all the counties of this State which now have a population of not less than 260,000," according to the last federal census, could "employ, appoint, and deputize one deputy constable as a law enforcement officer to serve under the supervision, direction, and control of the constable so making the appointment." Id. at 195. The other statute provided that constables in "all the counties of this State which now have a population of not less than" 300,000, according to the last federal census, could "employ, appoint, and deputize not more than two deputy constables as law enforcement officers to serve under their supervision." Id. The Court held that the statutes constituted invalid special laws because the word "now" used in the statutes could be construed only to "restrict application of the act to the counties having the stipulated population at the specific time of the enactment of the law." Id. Therefore, the Court concluded that because the use of the word "now" tied the applicability of the statutes to the date of enactment, the statutes were tantamount to the Legislature specifically naming counties in the legislation. See id.
More recently, this Court reaffirmed the principles articulated in Fort and Walker in Classic Mile, 541 So.2d at 1158, where the Court held that a statute that applied to only one county and had no possibility of ever applying to any other county constituted a special law. The statute at issue in Classic Mile authorized the receipt and display of simulcast thoroughbred horse racing, and pari-mutuel wagering thereon, at licensed facilities. See id. at 1157. The statute provided criteria for establishing a class of counties in which a facility could be licensed, including requiring the existence of two unused quarter horse racing permits before January 1, 1987. See id. The Court noted that all parties in the case agreed that Marion County was the sole county that would ever fall within the statutorily designated class of counties eligible for licensure of a facility. See id.
The Court held that the statute constituted an unconstitutional special law, despite the Legislature's treatment of the law as a general law, because it applied *150 only to Marion County, and there was no possibility that it would ever apply to any other county. See id. at 1158. Moreover, the Court concluded that because of the classification scheme employed by the statute, it could not be classified as a valid general law. See id.
The Court cited with approval its earlier opinion in Shelton v. Reeder, 121 So.2d 145 (Fla.1960), which explained that classifying counties on the basis of population must be reasonably related to the purpose of the statute in order for a statute to constitute a valid general law. See 541 So.2d at 1158. The Court concluded that no reasonable relationship existed between the statutory classification scheme in this case and the subject of the statute, explaining that "[i]n determining if a reasonable relationship exists `[t]he fact that matters is that the classification is potentially open to other tracks.'" Id. at 1159 (quoting Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 882 (Fla. 1983)). The Court also relied on Department of Legal Affairs in further explaining that "a statutory classification scheme incapable of generic application to members of a class, and fixed so as to preclude additional parties from satisfying the requirements for inclusion within the statutory classification at some future point in time, indicates an arbitrary classification scheme in the context of parimutuel legislation." Classic Mile, 541 So.2d at 1158 n. 4 (citing Department of Legal Affairs, 434 So.2d at 882).
Furthermore, the Court explained that "[a] statute is invalid if `the descriptive technique is employed merely for identification rather than classification.'" Classic Mile, 541 So.2d at 1159 (citing West Flagler Kennel Club, Inc. v. Florida State Racing Comm'n, 153 So.2d 5, 8 (Fla.1963)). The Court held that the statutory classification scheme at issue in Classic Mile constituted a descriptive technique used to identify Marion County, because
[t]he classification scheme fails to distinguish among the counties of Florida in any meaningful way with respect to the subject of the statute and establishes a class open only to Marion County, now and in the future. Because the statutory classification scheme is wholly arbitrary, having no reasonable relationship to the subject of the statute, the statute is not a valid general law.
Id.
In this case, section 218.503(5)(a) falls squarely within the definition of a special law as articulated by this Court in Fort, Walker, and Classic Mile. First, the population classification in this case constitutes nothing more than a "descriptive technique" used merely to identify three particular municipalities to which the statute applies. See Classic Mile, 541 So.2d at 1159. Limiting the statute to only those municipalities with populations of more than 300,000 on April 1, 1999, is tantamount to restricting the statute to those particular municipalities that met this population threshold on that particular date.
Second, section 218.503(5)(a) does not operate uniformly among similarly situated municipalities because it does not uniformly apply to all municipalities that have a population of 300,000 or more; rather, section 218.503(5)(a) applies only to those municipalities that have a population of 300,000 or more on or before April 1, 1999. Moreover, the Legislature passed the amendment on April 30, 1999, and the legislation had an effective date of July 1, 1999. Therefore, the qualifying date of April 1, 1999, had already expired even before the time the legislation was passed and before the legislation became law. Thus, as a result of the combination of the population threshold and the limiting date, the statute by its express terms forever *151 excludes any other municipalities that increase in size to meet the 300,000 population threshold after April 1, 1999. Consequently, no other municipality can ever grow into the population classification. Furthermore, because of the anchoring date, Miami, Tampa, and Jacksonville will always remain within the qualifying population classification, even if their populations fall in the future to below 300,000. Therefore, the population classification in section 218.503(5)(a) lacks uniformity in application.
Third, section 218.503(5)(a) employs an arbitrary classification scheme because it contains "a statutory classification scheme incapable of generic application to members of a class, and fixed so as to preclude additional entities from satisfying the requirements for inclusion within the statutory classification at some future point in time." Classic Mile, 541 So.2d at 1158 n. 4. Section 218.503(5)(a) is incapable of generic application to all municipalities that have a population of 300,000 or more because municipalities that reach this population threshold after April 1, 1999, are not eligible for inclusion in the class. Therefore, the April 1, 1999, deadline contained in the statute creates an arbitrary population classification. Thus, for the reasons discussed above, we hold that the statute constitutes an invalid special law under Fort, Walker, and Classic Mile.[7]
The City contends, however, that this Court's decisions in Golden Nugget Group v. Metropolitan Dade County, 464 So.2d 535 (Fla.1985), and State v. City of Miami Beach, 234 So.2d 103 (Fla.1970), upheld legislation substantially similar to that at issue in this case. Although City of Miami Beach involved a population classification, the statute in that case was not substantially similar to section 218.503(5)(a). In City of Miami Beach, 234 So.2d at 104 & n. 1, the Court considered whether a statute granting all cities and towns with a population of not less than 300,000 and not more than 340,000 and counties having a population of more than 900,000, according to the latest official decennial census, the right to impose a two percent resort tax constituted a special law. The statute stated that it would be applicable only to those cities and towns whose charters specifically provided for allowing the levy of the resort tax at the time of the statute's passage, or whose charters were subsequently amended before January 1, 1968. See id. The Court explained that, based upon the 1960 federal census, only Dade County and Broward County fell within the population brackets of the statute, but that the same census indicated that other counties were potentially within the population bracket of the statute. See id. at 105.
The Court concluded that the statute constituted a general law because the population classification was reasonable based on the State's interest in the promotion and further development of the tourist industry. See id. at 106. Furthermore, the Court explained that the statute was not limited to a specific census, as was the statute the Court invalidated in Walker. See City of Miami Beach, 234 So.2d at 106.
City of Miami Beach is thus distinguishable because the Court explicitly recognized in that case that the statute was not tied to a particular census, as was the statute the Court struck down in Walker. City of Miami Beach, 234 So.2d at 106. Therefore, the Court upheld the validity of the statute in City of Miami Beach precisely because the population classification *152 was "not limited to a particularly-designated census" or other particularly designated date. Id. Moreover, the Court in City of Miami Beach interpreted the statute to permit the enactment of charter amendments between the effective date of the act and January 1, 1968, by cities and towns located in all counties, regardless of whether the county met the population requirement by January 1, 1968. Id. Consequently, the Court concluded that the statute did not effectively limit the population classification to a particularly designated census, because cities and towns located in counties that failed to meet the population requirement by January 1, 1968, were not on the effective date of the statute, or at some subsequent date, prohibited from collecting the resort tax once the county met the population classification according to the latest census. Id. Therefore, unlike the statute at issue in this case, the statute in City of Miami Beach was open to other similarly situated cities and counties.
Further, Golden Nugget Group, 464 So.2d at 536, did not involve either a population classification or a substantially similar classification; rather the legislation employed a classification based on home rule charters. In Golden Nugget Group, this Court considered whether a statute that allowed "`[e]ach county, as defined in s. 125.011(1)' to levy a three percent convention development tax on payments made to rent, lease or use any living quarters or accommodations" constituted a special law. The statute was limited to those counties that operated "under a home rule charter adopted pursuant to ss. 10, 11 and 24 of Art. VIII of the Constitution of 1885, as preserved by Art. VIII, s. 6(e) of the Constitution of 1968." Id. The Court noted that Dade, Hillsborough, and Monroe Counties potentially met the statutory definition, but only Dade County had adopted a home-rule charter. See id. The Court "fully approved" the decision of the Third District, which held that the statute satisfied the criteria for a general law set forth in this Court's decision in Department of Legal Affairs, 434 So.2d at 882. Golden Nugget Group, 464 So.2d at 537. The Third District explained that the classification was reasonable in that case because the three counties potentially eligible for the tax had substantial tourist-oriented economies and the counties had concentrated on developing facilities that would attract convention tourists in order to improve the counties' tourist industries. See id.
Rather than focus on whether the statutory classification of home rule charter counties was reasonably related to the purpose of allowing these counties to impose a three percent convention development tax, the Court focused on a characteristic shared by the counties in the statutory classification; that is, that each county happened to have a substantial tourist-based economy. Thus, the Court never addressed the question as to whether the classification based on a home-rule charter was an impermissible closed class because it potentially applied to only three counties. However, the Court cited with approval to Department of Legal Affairs, 434 So.2d at 882, which also was relied on by this Court's subsequent opinion in Golden Nugget Group. In addition, the Court in Golden Nugget Group does not cite to any of its prior opinions in Fort, Walker, and City of Miami Beach. Accordingly, there is no indication that the Court in Golden Nugget Group intended to recede from its prior approach to analyzing when a statute is an impermissible special law. Cf. Puryear v. State, 810 So.2d 901, 905 (Fla.2002) (stating that "this Court does not intentionally overrule itself sub silentio").
The City further argues that with the addition in the 1968 Florida Constitution of article III, section 11(b), which occurred *153 after Fort and Walker, and before Golden Nugget Group and City of Miami Beach, all that is required to satisfy the special law prohibition is that a classification be reasonably related to the subject of the statute.[8] We disagree. Although the reasonable relationship test is part of determining whether a closed population classification is arbitrary, article III, section 11(b) does not alter the prohibition against special laws.
First, as noted above, this Court in Classic Mile explained:

Shelton v. Reeder, 121 So.2d 145 (Fla. 1960), and West Flagler Kennel Club, Inc. v. Florida State Racing Comm'n, 153 So.2d 5 (Fla.1963), test a reasonable relationship between the statutory classification and the purpose of the statute.... We note that art. III, § 11(b) applies a different test requiring that a valid general law classify only in a manner reasonably related to the subject of the statute. This distinction in terminology does not affect our conclusion in this case.
541 So.2d at 1159 n. 5.
Second, the City's basic premise that City of Miami Beach is controlling because it applies the amended constitutional "test" for reviewing population classifications is flawed because the Legislature enacted the statutes under review in City of Miami Beach in 1967, and the Court stated that "[t]he organic demands of the Constitution of 1885 did not forbid the enactment of general laws containing reasonable classifications as to population or otherwise." 224 So.2d at 105. Thus, contrary to the City's contention, the Court in City of Miami Beach did not rely upon the 1968 amendment to the Florida Constitution in upholding the statute in that case.
Third, decisions decided before the 1968 amendment are easily reconciled with decisions decided after the 1968 amendment. In Walker, this Court explained that a classification of counties may be upheld as a general law so long as the classification used is just and reasonable. 132 So.2d at 193. "The arbitrary classification of counties by population for the purpose of avoiding the organic requirement of publication of notice of intention to apply to the legislature for the passage of proposed local or special law, however, is not permitted or sanctioned by the Constitution." Walker, 132 So.2d at 193 (quoting Carter v. Norman, 38 So.2d 30, 32 (Fla. 1948)). Therefore, this Court applied a reasonable relationship test to the statute, concluding that fixing a population classification to a specific date constituted an arbitrary classification. See id. at 193-94. This analysis is consistent with Classic Mile, which held that "[a] statutory classification scheme must bear a reasonable relationship to the purpose of the statute in order for the statute to constitute a valid general law." 541 So.2d at 1157. Therefore, cases decided both before and *154 after the 1968 amendment to article III, section 11(b), demonstrate that this Court utilizes a reasonable relationship test for analyzing special laws, but that a population classification tied to a specific date will fail this test if it constitutes an arbitrary classification.
In conclusion, tying the population threshold to an anchoring date of April 1, 1999a date that preceded the effective date of the legislationcreated an arbitrary classification. No reasonable explanation has been advanced for the limiting date, nor can we conceive of one. This Court has consistently held that this type of closed class restriction will constitute an invalid special law passed in violation of the Florida Constitution. Thus, we conclude that section 218.503 constitutes an invalid special law. However, because we do not address the effect of the 2001 amendments to section 218.503, on remand the parties may have the opportunity to brief and argue the effect, if any, of the 2001 amendments to section 218.503(5) on the issues in this case, including whether the City meets the amended criteria to qualify it to impose the tax under the amended statute. Further, because the City has raised for the first time in this appeal the proper remedy in this case if the statute is held unconstitutional, we likewise do not reach that issue. We therefore affirm the Third District's decision in this case and remand for proceedings consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., and HARDING, WELLS, LEWIS, and QUINCE, JJ., concur.
SHAW, J., concurs in result only.
NOTES
[1] The amendment became effective on July 1, 1999. See ch. 99-251, § 132, at 2839, Laws of Fla. The Legislature passed the amendment on April 30, 1999, and the Governor signed the amendment into law on June 8, 1999.
[2] The Governor signed a law amending section 218.503(5)(a) and (c) on November 30, 2001. See Ch.2001-354, Laws of Fla. The law amends section 218.503(5)(a) and (c) as follows:

(5)(a) The governing authority of any municipality having with a resident population of 300,000 or more on or after April 1, 1999, and which has been declared in a state of financial emergency pursuant to this section within the previous 2 fiscal years may impose a discretionary per-vehicle surcharge of up to 20 percent on the gross revenues of the sale, lease, or rental of space at parking facilities within the municipality which that are open for use to the general public.
. . . .
(c) This subsection expires is repealed on June 30, 2006.
Section 2. This act shall take effect upon becoming a law.
(Additions in underline, deletions in strike-through). Moreover, on December 17, 2001, the Governor signed chapter 2001-373, Laws of Florida, which provides in full:
Section 1. Any ordinance of any municipality imposing a surcharge pursuant to section 132, chapter 99-251, Laws of Florida, is hereby ratified. All acts and proceedings, including enforcement procedures, taken in connection with a parking surcharge imposed by a municipality pursuant to section 132, chapter 99-251, Laws of Florida, are ratified, validated, and confirmed, and the surcharge is declared to be legal and valid in all respects from the date of enactment of chapter 99-251, Laws of Florida.
Section 2. This act shall take effect upon becoming a law.
The amendments were made in an attempt to cure the perceived defect in the original enactment. See Fla. S. Comm. on Fin. & Tax'n, SB 54-B (2001) Staff Analysis 5 (Oct. 22, 2001) (on file with comm.). Appellees argue, however, that the Legislature cannot retroactively validate a tax if that tax was unconstitutional when passed. Further, appellees argue that by the terms of the amendments, the City would not have qualified to impose a municipal tax under the amended statute because it was not in a state of financial emergency at the time it passed the parking tax. Because these issues involve mixed questions of law and fact and because the Legislature passed the amendments after the Third District's decision in this case, we decline to address in this opinion the effect of these amendments on the issue before us.
[3] Article VII, section 1(a), of the Florida Constitution provides:

No tax shall be levied except in pursuance of law. No state ad valorem taxes shall be levied upon real estate or tangible personal property. All other forms of taxation shall be preempted to the state except as provided by general law.
Article VII, section 9(a), of the Florida Constitution provides:
Counties, school districts, and municipalities shall, and special districts may, be authorized by law to levy ad valorem taxes and may be authorized by general law to levy other taxes, for their respective purposes, except ad valorem taxes on intangible personal property and taxes prohibited by this constitution.
[4] McGrath contends that Tampa had a resident population of 297,505 on April 1, 1999, and that Jacksonville is not a municipality within the meaning of the statute. Compare art. VIII, § 6(e), Fla. Const.; art. VIII, § 9, Fla. Const. (1885) (Jacksonville is a consolidated government treated as a county), with § 218.503(5), Fla. Stat. (2000) (the parking tax may be imposed only by a "municipality") and §§ 218.502, 218.503(3), Fla. Stat. (2000) (distinguishing municipalities from counties). However, in McGrath's complaint, he admits that the populations of Miami and Jacksonville exceeded 300,000 on April 1, 1999. Moreover, the City submitted an affidavit before the hearing on the motions for summary judgment stating that the population of Tampa, within reasonable statistical certainty, exceeded 300,000 on April 1, 1999. At the summary judgment hearing, McGrath advised the trial court that it accepted the City's assertion of fact for purposes of McGrath's cross-motion for summary judgment. However, McGrath contends on appeal to this Court that he did not concede these facts for purposes of the City's motion for summary judgment. For purposes of this opinion, we assume, without deciding, that the statute applied to Miami, Tampa, and Jacksonville.
[5] The record is devoid of any information as to whether Jacksonville and Tampa would meet the requirement of having been declared in a state of financial emergency within the two previous fiscal years. In fact, the parties in this case dispute whether the statutory language "previous two fiscal years" refers to the two-year time period before the statute was enacted, or the two years prior to the tax being imposed. If only the City of Miami met this additional statutory limitation, this would of course only further appellees' argument that section 218.503(5)(a) constitutes a special law.
[6] We note the distinction between the specific prohibition against special laws involving non-ad valorem taxation and the more general restrictions regarding passage of special laws involving other matters. With regard to the general restrictions regarding passage of special laws, article III, section 10, of the Florida Constitution permits the passage of special laws generally if "notice of intention to seek enactment thereof has been published in the manner provided by general law." Moreover, notice is not required "when the law, except the provision for referendum, is conditioned to become effective only upon approval by vote of the electors of the area affected." Art. III, § 10, Fla. Const. In contrast, article VII, section 9(a), of the Florida Constitution specifically provides that counties, school districts, and municipalities may be authorized by general law to levy non-ad valorem taxes. Art. VII, § 9(a), Fla. Const. See also art. VII, § 1(a), Fla. Const. ("All other forms of taxation shall be preempted to the state except as provided by general law."); Alachua County, 702 So.2d at 1254. In other words, under no circumstances may the Legislature pass a special law authorizing a local government to impose non-ad valorem taxes.
[7] Moreover, we reject the City's contention that the sunset provision contained in section 218.503(5)(c) somehow cures the fact that the statute constitutes a special law.
[8] Article III, section 11(b), of the Florida Constitution currently provides: "In the enactment of general laws on other subjects, political subdivisions or other governmental entities may be classified only on a basis reasonably related to the subject of the law." Article III, section 21, of the Florida Constitution of 1885, which was the predecessor provision to article III, section 11(b), provided in pertinent part:

[N]o local or special bill shall be passed, nor shall any local or special law establishing or abolishing municipalities, or providing for their government, jurisdiction and powers, or altering or amending the same, be passed, unless notice of intention to apply therefor shall have been published in the manner provided by law where the matter or thing to be affected may be situated, which notice shall be published in the manner provided by law at least thirty days prior to introduction into the Legislature of any such bill.